J-S67016-17
J-S67017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M.-S., D.M.-S., J.M.-S, J.S., D.S., MINOR CHILDREN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.S., FATHER | : | No. 1988 EDA 2017 |

Appeal from the Order Entered May 26, 2017
in the Court of Common Pleas of Monroe County,
Orphans' Court at No(s):  22 O.C.A. 2017,
23 O.C.A. 2017, 24 O.C.A. 2017,
25 O.C.A. 2017, 26 O.C.A. 2017

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M.-S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | No. 1993 EDA 2017 |

Appeal from the Order Entered May 26, 2017
in the Court of Common Pleas of Monroe County,
Orphans' Court at No(s):  22 O.C.A. 2017

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M.-S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | No. 1996 EDA 2017 |

Appeal from the Order Entered May 26, 2017
in the Court of Common Pleas of Monroe County,
Orphans' Court at No(s):  23 O.C.A. 2017

_____
* Former Justice specially assigned to the Superior Court.

J-S67016-17
J-S67017-17

| IN THE INTEREST OF: D.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | No. 1997 EDA 2017 |
| APPEAL OF: J.M., MOTHER | | |

Appeal from the Order Entered May 26, 2017
in the Court of Common Pleas of Monroe County,
Orphans' Court at No(s):  24 O.C.A. 2017

| IN THE INTEREST OF: J.M.-S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | No. 2003 EDA 2017 |

Appeal from the Order Entered May 26, 2017
in the Court of Common Pleas of Monroe County,
Orphans' Court at No(s):  25 O.C.A. 2017

| IN THE INTEREST OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | No. 2004 EDA 2017 |
| APPEAL OF: J.M., MOTHER | | |

Appeal from the Order Entered May 26, 2017
in the Court of Common Pleas of Monroe County,
Orphans' Court at No(s):  26 O.C.A. 2017

BEFORE:   GANTMAN, P.J., MUSMANNO, J., and STEVENS*, P.J.E.

MEMORANDUM BY MUSMANNO, J.:                    **FILED JANUARY 11, 2018**

- 2 -

D.S. ("Father") and J.M. ("Mother") appeal from the Orders[1] granting the Petitions filed by Monroe County Children and Youth Services ("CYS"), involuntarily terminating their parental rights to J.M.-S. (a son, born in January 2002), Do.M.-S. (a daughter, born in May 2003), Da.M.-S. (a daughter, born in October 2004), J.S. (a son, born in January 2008) and D.S. (a daughter, born in June 2009) (collectively, "Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). We affirm.

In its Opinion, the trial court aptly summarized the relevant factual and procedural history underlying this case, which we adopt for the purpose of this appeal. *See* Trial Court Opinion, 7/11/17, at 1-15.

On appeal, Father raises the following issues for our review:

1. Did [CYS] fail to present clear and convincing evidence that termination of [F]ather's parental rights served the needs and interests of [C]hildren?

2. Did [the] trial court err in terminating [F]ather's parental rights without clear and convincing evidence that termination of

---

[1] The trial court entered five separate Orders, which terminated the parental rights of both Father and Mother as to each child on separate dockets. Father improperly filed a single appeal from the Orders. *See* Pa.R.A.P. 341, Note (stating that "[w]here … one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). However, if Father had filed separate appeals, those appeals would have been consolidated. Thus, we discern no prejudice arising from Father's procedural misstep, and we decline to quash Father's appeal. Mother filed separate appeals from the Orders, and this Court, *sua sponte*, consolidated Mother's appeals. Because these consecutively listed appeals arise from the same set of facts and raise similar challenges to the Orders, we consolidated the appeals for disposition.

[F]ather's parental rights served the needs and interests of [C]hildren?

Father's Brief at 23.[2]

Mother raises the following issues for our review:

1. Did the [] Orphan[s'] Court err and/or abuse its discretion in concluding that clear and convincing evidence was presented that [Mother] either evidenced a settled purpose of relinquishing [her] parental claim to [Children], or refused or failed to perform [her] parental duties?

2. Did the [] Orphan[s'] Court err and/or abuse its discretion in finding that clear and convincing evidence had been presented that [Mother] cannot or will not remedy the conditions which led to the removal of [C]hildren?

3. Did the [] Orphan[s'] Court err and/or abuse its discretion in finding that clear and convincing evidence had been presented that termination of parental rights would best serve the needs and welfare of [Children], when there was no evidence that the termination of [] Mother's parental rights would aid in achieving permanency for [C]hildren?

4. Did the [] Orphan[s'] Court err and/or abuse its discretion in determining that the termination of [Mother's] parental rights would serve the developmental, physical and emotional needs

---

[2] We note that although Father's Statement of Questions Presented includes two separate issues, Father identified only one issue in his Concise Statement. *See* Pa.R.A.P. 1925(b)(4)(ii) (providing that "[t]he Statement shall concisely identify each ruling or error that the appellant intends to challenge"). Additionally, the Argument section of Father's brief includes a discussion of only one issue. *See* Pa.R.A.P. 2119(a) (providing that "[t]he argument shall be divided into as many parts as there are questions to be argued"). However, because the issues identified in Father's Concise Statement and the Argument section of his brief can fairly be read to include both of his Questions Presented, we find his claims sufficiently preserved for our review.

and welfare of [Children] in consideration of the bond between []
Mother and [C]hildren?

Mother's Brief at 17-18.

Our standard of review is as follows:

[A]ppellate courts must apply an abuse of discretion
standard when considering a trial court's determination of a
petition for termination of parental rights. As in dependency
cases, our standard of review requires an appellate court to
accept the findings of fact and credibility determinations of the
trial court if they are supported by the record. If the factual
findings are supported, appellate courts review to determine if
the trial court made an error of law or abused its discretion. As
has been often stated, an abuse of discretion does not result
merely because the reviewing court might have reached a
different conclusion. Instead, a decision may be reversed for an
abuse of discretion only upon demonstration of manifest
unreasonableness, partiality, prejudice, bias, or ill-will.

[U]nlike trial courts, appellate courts are not equipped to
make the fact-specific determinations on a cold record, where
the trial judges are observing the parties during the relevant
hearing and often presiding over numerous other hearings
regarding the child and parents. Therefore, even where the
facts could support an opposite result, as is often the case in
dependency and termination cases, an appellate court must
resist the urge to second guess the trial court and impose its
own credibility determinations and judgment; instead we must
defer to the trial judges so long as the factual findings are
supported by the record and the court's legal conclusions are not
the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (citations

omitted).

Father and Mother each challenge the sufficiency of the evidence

presented by CYS. Additionally, Father and Mother both argue that the trial

court afforded undue weight to their respective incarcerations in terminating

- 5 -

their parental rights to Children. *See* Father's Brief at 26-29; Mother's Brief at 34-36.

In its Opinion, the trial court set forth the relevant law, detailed its considerations in terminating Father's and Mother's parental rights, and concluded that CYS had proven by clear and convincing evidence that termination of Father's and Mother's parental rights was in Children's best interests pursuant to subsections 2511(a)(1), (2), (5), (8) and (b). *See* Trial Court Opinion, 7/11/17, at 15-34; *see also id.* at 3 (wherein the trial court incorporated by reference its statement of reasons, made on the record during the termination hearing, for terminating Father's and Mother's parental rights); N.T., 5/26/17, at 69-80 (wherein the trial court summarized its reasons for terminating Father's and Mother's parental rights). We note that we need only affirm the trial court's decision with regard to one subsection of section 2511(a), along with consideration of section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). However, we agree with the trial court's analysis and determinations as to each of these subsections, and discerning no abuse of discretion or error of law, we adopt the trial court's recitation as though fully set forth herein. *See* Trial Court Opinion, 7/11/17, at 15-34.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/11/18

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
JUVENILE COURT DIVISION

| | | |
|---|---|---|
| IN THE INTEREST OF<br>Do.M.-S. | : | **22 OCA 2017** |
| a minor | : | **APPEAL No. 1993 EDA 20167** |
| | : | **APPEAL No. 1988 EDA 2017** |

| | | |
|---|---|---|
| IN THE INTEREST OF<br>Da.M.-S. | : | **23 OCA 2017** |
| a minor | : | **APPEAL No. 1996 EDA 2017** |
| | : | **APPEAL No. 1988 EDA 2017** |

| | | |
|---|---|---|
| IN THE INTEREST OF<br>J.M.-S. | : | **24 OCA 2017** |
| a minor | : | **APPEAL No. 1997 EDA 2017** |
| | : | **APPEAL No. 1988 EDA 2017** |

| | | |
|---|---|---|
| IN THE INTEREST OF | : | **25 OCA 2017** |
| J____ Js____, a minor | : | **APPEAL No. 2003 EDA 2017** |
| | : | **APPEAL No. 1988 EDA 2017** |

| | | |
|---|---|---|
| IN THE INTEREST OF | : | **26 OCA 2017** |
| D___S____, a minor | : | **APPEAL No. 2004 EDA 2017** |
| | : | **APPEAL No. 1988 EDA 2017** |

## OPINION PURSUANT TO Pa. R.A.P. 1925(a)

J___ M____ ("Mother") and Da.S. ("Father") have appealed our

May 26, 2017 decrees that terminated their parental rights to their children, J.M.-S. age 15; Do.M.-S. age 14;

___, age 12; J___ S___ __, age 9; and D___S[___] age 7 (collectively

the "Children"). Both parents complied with the Fast Track rules by filing their Rule

1

1925(b) statements with their notices of appeal.[1] We now issue this opinion pursuant to Pa.R.A.P. 1925(a).

## Background

Monroe County Children and Youth Services ("CYS" or "the Agency") has had an extensive forty-month history with this family which is comprised of Mother, Father, the Children, the Children's half-sister, S.J., and S.J.'s father, K.J. As to Mother, the history is marked by: Mother's own criminal history, which includes among many other things drug use and trafficking, that caused Mother to be incarcerated or on the run for substantial periods of time, including incarceration from July 2016 to the present, after the Children and S.J. came into care; Mother being the victim of severe domestic violence, witnessed by the Children, perpetrated by Father; and the termination of Mother's parental rights to S.J. As to father, the history is similarly marked by Father's own criminal history, which includes incarceration for his severe assault on Mother and subsequent drug trafficking charges for which Father is currently facing trial. As to both parents, the history is marked by their inability to remedy the conditions which caused the children to come into care, to stay out of jail, or to satisfy family service and permanency plan goals. Finally, as to the Children, the history unfortunately includes witnessing Father's violence toward Mother, suffering through both parents' current and prior periods of incarceration, lack of parenting by Mother and Father, lack of meaningful kinship supports, separation from each other until recently, and an

---

[1] Five separate decrees -- one for each of the five children -- were issued. Father filed one notice of appeal in which he listed all five of the captioned cases. As a result, his appeal has been assigned a single appeal docket number. Mother filed individual notices of appeal in each case. Accordingly, her appeals have been assigned five separate appeal docket numbers. We are filing a single appeal opinion, listing all docket numbers assigned in this Court and the Superior Court, since the children are siblings, the decrees were issued after a consolidated hearing, and the relevant facts, circumstances, evidence, and issues are the same in all five cases. Because there is overlap between the initials of the parents and children, we will from this point on use each child's first name when referring individually to the child and the term "the Children" when referring collectively to the children.

2

emotional roller coaster the course of which has mirrored the ups, downs, and incarceration of both parents.

The challenged decrees were issued after a termination of parental rights ("TPR") hearing that was held on May 26, 2017. At the conclusion of the hearing, we orally announced our determination that CYS had by clear and convincing evidence proven both statutory grounds for termination of the parental rights of Mother and Father and that termination would best serve the needs, welfare, and interests of the Children. In doing so, we summarized the evidence, our findings, and our reasoning. (N.T., 5/26/2017, pp. 69 – 80). We incorporate our on-record statements into this opinion by reference.

The early factual and procedural history of this case is detailed in the opinion we issued in response to Mother's appeal of our September 2, 2016 decree terminating Mother's parental rights to S.J. and the Superior Court's memorandum opinion affirming our decision. For convenience and ease of reference, a copy of our opinion is attached as Appendix A and a copy of the Superior Court's opinion is attached as Appendix B. We incorporate both opinions into this opinion by reference.

For the most part, the attached opinions and our on-record statements during the May 26, 2017 TPR hearing suffice to explain why we terminated Mother's and Father's parental rights, to summarize our findings and conclusions, and to dispel the claims of error raised in these appeals. We add only the following, which is designed to: 1) provide an overview sufficient to place the substance of this opinion in context; 2) add-in facts about Father that were not included in our prior opinion; and 3) summarize the history of these cases from the point where the attached opinions left

3

off.

The Children first came to the attention of CYS in September 2013 when the Agency received a referral that while pregnant with S.J. and the caretaker of the Children Mother was arrested for, among other things, possession of heroin and endangering the welfare of children, an event that led to revocation of an ARD that Mother had received for a prior Driving Under the Influence arrest. (N.T. 09/01/2016, p. 5; criminal docket 2874 CR 2013; N.T., 5/26/2017, CYS Exhibit 27). Between the initial referral and S.J.'s birth on December 10, 2013, CYS received multiple referrals that Mother was using drugs while pregnant and caretaking the Children.

When S.J. was born, the referrals were borne-out. At birth, Mother tested positive for cocaine and opiates. Similarly, a records review revealed that Mother had tested positive for opiates at her first pre-natal care appointment in June of 2013. Not surprisingly, S.J. was born addicted to cocaine and opiates. As a result, she was prescribed methadone until being weaned off the drug in February 2014. (N.T. 09/01/2016, pp. 6-8).

In December of 2013, S.J. and the Children were found dependent. All six children have remained dependent and in care ever since.

During the early period of these cases, Father, who has a substantial criminal history, was in jail after being arrested for assaulting Mother. He later pled guilty to Aggravated Assault and was sentenced to incarceration of 11 and ½ to 23 months, followed by probation. (See N.T., 5/26/2017, CYS Exhibit 26). Father was not actively involved in the cases until after his release from prison.

Mother, in turn, made some attempts to work toward service plan goals and get

4

the Children back. Initially, Mother, who is and has been plagued with substance abuse and drug trafficking issues of her own, entered an inpatient drug and alcohol treatment program. However, she left against medical advice. Although not perfect in attendance, Mother consistently visited the Children until she was incarcerated on May 13, 2014, due to her September 2013 arrest and the ARD revocation. Up until her incarceration, Mother continued to test positive for illegal substances and alcohol. While Mother was incarcerated, the Agency arranged for jail visits between Mother and S.J. (N.T. 09/01/2016, p. 11). In addition, Mother completed drug and alcohol programs and parenting classes that were available at the correctional facility. (N.T. 09/01/2016, pp. 8- 12).

Mother was released from jail on August 11, 2014. Mother informed CYS she was looking for a job and would be living in Philadelphia. At an October 23, 2014 permanency review hearing, Mother provided pay stubs demonstrating that she was working at Macy's. After being released, Mother continued weekly or bi-weekly office visits and tested negative for drugs and alcohol.

In February 2015, Mother obtained an apartment in Scranton, Pennsylvania. In an effort to begin home visitation, the Agency conducted a home study of the apartment in March 2015. The Agency found the home was appropriate and the Children began weekend visits. At that time, it was believed that, relatively speaking, Mother was making some progress toward having the children transitioned to her home in Scranton. However, the progress, or appearance of progress, was short lived.

On March 27, 2015, the Agency conducted an unannounced home visit. When caseworkers arrived, Mother was not at home. Instead, the Children were being

5

watched by Mother's brother for whom the Agency did not have the required clearances. The Agency informed Mother that she needed to be the sole caretaker during the home visits. (N.T. 09/01/2016, p. 17).

Then, on April 7, 2015, Mother was arrested and incarcerated for possession with intent to deliver heroin and crack cocaine after two drug buys were conducted at her home. (N.T. 09/01/2016, p. 18). This was the same day that the Children had returned from a home visit. (N.T. 09/01/2016, p. 18). Mother told the Agency that she sold drugs because she needed money. (N.T. 09/01/2016, p. 19). Mother was incarcerated until October 20, 2015.

On May 8, 2015, the Agency filed TPR petitions seeking termination of the parental rights of Mother to S.J. and the Children, of Father to the Children, and of K.J. to S.J. In the underlying dependency proceedings, CYS sought a change of goal to adoption.

On October 28, 2015, after a lengthy multi-day hearing,[2] we issued orders that changed the goal in the dependency cases of all six children to adoption. The goal changes were not appealed.

We terminated the parental rights of S.J.'s father because he had never been a part of her life. Further, the lengthy period of incarceration he was serving incapacitated him. While a close call, and even though an argument could have been made that statutory grounds for termination had been established, we declined, at the time, to terminate the parental rights of Mother and Father. In summary, by the end of the TPR hearing, Mother and Father had both been released from prison. Prior

---

[2] The parties did not request transcription of the 2015 TPR proceedings for either these appeals or the prior appeal filed by Mother in S.J.'s case.

to being arrested again in April of 2015, Mother had made some progress on her family service plan goals. Based on this history it appeared that, although the road was narrowing significantly, there was a potentially plausible path to reunification. In addition, the Children were bonded with Mother, those who were age 12 or older were adamant that they would not consent to adoption, and not all of the Children were in pre-adopt homes or placements that would otherwise provide permanency. Finally, S.J. had been in her current foster home only ten days as of the date the TPR petition was filed and only six months as of the date our orders were issued.

In our orders, we provided guidance to CYS, Mother, and Father. In addition, we placed Mother and Father on notice that we would not permit any of the Children to languish in foster care and that parental failure to make progress would result in termination of parental rights. Specifically, our orders provided:

> **AND NOW,** this 28th day of October, 2015, following hearings on the petitions of Monroe County Children and Youth Services ("CYS") for termination of the parental rights of [J.M.] ("Mother"), the mother of all of the minor children, [D.S.] ("Father"), the father of all of the minor children except [S.J. (a/k/a [S.M.]), and [K.J.], the father of [S.J.], it is ORDERED that the petitions are DENIED with respect to Mother and Father. The petition pertaining to [S.J.] is GRANTED as to [K.J.] ONLY. A decree terminating [K.J.'s] parental rights to [S.J.] is being separately issued.
> These denials are without prejudice to the ability of CYS to re-petition in the event that Mother, Father, or both, fail to continue to progress toward reunification, alleviate of the conditions that caused the children to come into care, or fail to provide permanency for the children, or if the children who are over the age of twelve (12) indicate that they would consent to adoption.
> The goal in the underlying dependency cases for each of the children is changed to adoption, with a concurrent goal of reunification. CYS shall amend the family service and permanency plans to reflect the change in goals. The plans shall clearly set forth goals and objectives for

7

Mother and Father to follow in order to continue to work toward reunification and shall establish specific time frames for achievement of the goals. The plans shall also be amended to include other provisions that, given the facts and history of this case, CYS reasonably believes are necessary for the health, safety, and welfare of the children and for the attainment of permanency.

The dependency cases shall be reviewed by the court at 2:30 p.m. on February 1, 2016, Courtroom No. 3, Monroe County Courthouse, Stroudsburg, Pennsylvania, and thereafter, will be reviewed by the court every three months until permanency is achieved.

Mother and Father are again advised that this Court will not allow the children to unnecessarily languish in foster care without attainment of the permanency that the law demands and the children deserve. Therefore, both parents are advised that their failure to comply with family service goals or to continue to progress toward and achieve reunification will result in the re-filing of termination petitions.

(Orders, entered October 28, 2015).

Unfortunately, Mother was unable to summon the ability to parent, to make progress, or to remedy the conditions that caused S.J. and the Children to come into care.

Specifically, upon her release from jail and after we denied the Agency's first TPR petitions, Mother had weekly office visits with S.J. and the Children. However, on January 11, 2016, the Agency was notified by Mother's probation officer that she tested positive for cocaine and there was a warrant out for her arrest. Mother absconded until she was arrested again for Possession with Intent to Deliver in July of 2016. She has been in jail ever since. While on the run before being arrested, Mother maintained infrequent contact with CYS and was totally out of the Children's lives. She did not even call or write to them. The family's CYS caseworker testified that Mother did not ask about the Children on the few occasions when she did contact the Agency.

8

(N.T. 09/01/2016, pp. 21, 22, 44; N.T., 5/26/2017, pp. 43-48, 50-55, CYS Exhibit 27).

As a result, CYS filed another TPR petition, this one seeking only termination of Mother's rights to S.J. A hearing on the petition was held on September 1, 2016. [3] Sadly, as of that second TPR hearing, Mother had not seen or even attempted to visit S.J. or the Children in eight months and was awaiting sentencing on her latest drug arrest. (N.T. 09/01/2016, p. 27; N.T., 5/26/2017, pp. 43-48, 50-55, CYS Exhibit 27). Mother did not testify at the second TPR hearing. Instead, a third party, Mother's attorney, attempted to convey that Mother loves S.J. and did not want to lose her.

After the hearing, we terminated Mother's parental rights to S.J. for the reasons set forth in the opinion attached as Appendix A. As indicated, the Superior Court affirmed. Mother did not file a petition for allowance of appeal.

Both before and after the second TPR hearing, Father made attempts to get the Children back and made some progress on service plan goals. However, the progress did not last. Like Mother, he ended up being arrested again and incarcerated on new drug trafficking charges for which he remains in jail. In summary:

Early on, for the reasons stated, the focus was on returning the Children to Mother. However, after Father was released from prison and Mother was arrested and incarcerated again on parole violations and new drug trafficking charges, the focus shifted to Father.

CYS set up services to help reintegrate Father into the Children's lives. Among

---

[3] The September 1, 2016 proceeding was originally scheduled as a combined TPR and dependency review hearing. However, because Father and the Children were not involved in S.J.'s TPR action, there were some behavioral issues with the Children when they came to court, and there were logistical considerations regarding attorneys, the hearing was bifurcated. We first convened S.J.'s TPR hearing, and then, upon conclusion, opened the review hearing involving all of the Children. The TPR portion of the hearing was transcribed for Mother's appeal in S.J.'s case. The transcript is available, is cited in this opinion, and is included in the Certified Record transmitted in theses appeals. No party asked for transcription of the dependency review portion of the hearing.

9

other things, family therapy was set up to help with the transition and to allow the Children and Father to work through issues which arose from removal of the Children from Mother's care; Father's abuse of Mother; and Father coming back into the Children's lives after being incarcerated. In addition to therapy, CYS set up visits, independently and around therapy appointments. Further, CYS provided assistance to Father in his quest to obtain housing and beds and other furniture for the Children so that he could make his apartment suitable for them. (N.T., 5/26/2017, pp. 8-16, 66).

Father was fairly consistent in visiting. To move the case forward, visits between Father and the Children were moved into the community. Father had difficulty controlling the Children in that setting, so visit coaches were provided. However, despite prompts, Father did not invest or participate in the therapy, attending only one session. (N.T., 5/26/2017, pp. 8-16).

Father obtained a job at an Amazon distribution center, ultimately found a suitable apartment, and started a relationship with a woman whom he designated as his support for his reunification efforts. At that point, in early 2017, home visits were started. (N.T., 5/26/2017, pp. 14-20).

However, the relative progress that Father was making with the support of his paramour and substantial assistance from the Agency was short lived. In February 2017 Father was arrested and incarcerated on felony drug trafficking charges which involved, among other things, Father having heroin and crack cocaine in his apartment – the apartment in which the Children were about to visit. He has been in jail ever since the arrest. The arrest occurred immediately prior to a scheduled weekend visit. Disturbingly, Father's paramour picked up the Children and kept them for the weekend

10

visit without informing CYS or the Children's foster parents that Father had been arrested and jailed. (N.T., 5/26/2017, pp. 18-23).

On March 3, 2017, a review hearing was convened. At that time, both parents were in jail in Lackawanna County. Mother appeared. Father did not attend. The case was reviewed, the Children's dependencies were continued, and the Agency indicated its intent to immediately file TPR petitions.

On March 9, 2017, CYS filed TPR petitions seeking termination of both parents' parental rights. A hearing on the petition was scheduled for May 26, 2017.

Mother asked for visits with the Children. CYS set up visits with both parents at the Lackawanna County Correctional Facility. After a visit, the Children ran away from the CYS caseworker, including running into the streets and traffic, and scattered themselves around Scranton. It took the caseworker, an aide, and the Scranton police to round them up. (N.T., 5/26/2017, pp. 24-27).

During Mother's incarceration, she wrote to the Children. However, tellingly, they did not write back to her. In addition, Mother applied to participate in programs available in the facilities in which she was jailed. At the time of the third TPR hearing, Mother was housed in SCI Muncy. She had applied and was purportedly on waiting lists for parenting classes, the institution's drug and alcohol program, and domestic violence counseling. (N.T., 5/26/2017, pp. 31, 39-44, 59-60, 68).

As of the third TPR hearing, Mother had pled guilty, had been sentenced on her plea and attendant parole violation, and was incarcerated in SCI Muncy. Although the specifics of the sentences for the parole violation and the new charges were not completely clear, it was pretty well documented that Mother was serving an aggregate

11

sentence of 15 to 48 months. According to Mother, her parole eligibility date is October 1, 2017. If that is accurate, her maximum sentence date is July 1, 2020. (N.T., 5/26/2017, pp. 54-55, 61, CYS Exhibit 27).

Father, in turn, was still in the Lackawanna County Correctional Facility awaiting trial on his newest drug trafficking charges. Given his prior record, it is clear that if convicted he is facing significant time. Immediately prior to the third TPR hearing, Father applied for release to a drug and alcohol rehabilitation facility. He told the family's caseworker that he would be released on that request prior to the hearing. However, as of the hearing, he had not been released. (N.T., 5/26/2017, pp. 27-28, CYS Exhibit 26).

Mother asked for and was given a visit with the Children while she was temporarily housed in the Monroe County Correctional Facility awaiting the third TPR hearing. Father did not request a visit. (N.T., 5/26/2017, p. 31).

At the third TPR hearing, the family's CYS caseworker testified. She recounted the history of these cases and brought the case forward from the date of the second TPR hearing. In addition, she testified about the Children.

Unfortunately, for a variety of reasons, the Children have not been together in foster care. The reasons include the unfortunate lack of family resources, the number of children involved and their differing ages, the special needs of some of the Children, the differing school placements, regulations regarding how many children may be in a single foster home, and the unfortunate history whereby Mother and Father took turns being arrested and incarcerated after making some relative progress.

However, as of the date of the hearing, three of the Children were together in

12

one foster home, and CYS had worked hard to develop and implement a plan whereby, at the conclusion of the 2016-2017 school year, the other two children would move into the same home – a home in which the foster parents wanted to be permanent resources for all five of the Children. Specifically, shortly before the hearing, J.M.-S. moved into the same foster home where Do.M.-S. and J.S. had been living. After the end of the school year, Da.M.-S. and D.S. (who at the time was in the same home as S.J.) would also be moving in. (N.T., 5/26/2017, pp. 28 -29, 32).

Not unexpectedly, these cases, the parents' pattern of being in and out of jail, and the length of placement have taken a toll on the Children. Each time that Mother and Father took turns making some progress toward reunification and then being incarcerated, the Children's behaviors declined. The behaviors have manifested themselves in school, in court, in foster homes, in the streets of Scranton as indicated above, and in the Children's interactions with caseworkers. By the time the third TPR hearing was convened, the Children were physically, mentally, emotionally, and spiritually drained. They were tired of these cases, tired of being in court, and tired of waiting for their parents to be released from jail. The effect the history of these cases has had on the Children is clear from the two-dimensional record. The effect was even clearer and was palpable in real-time and in person.

As of the hearing, J.M.-S. and Do.M.-S. the two oldest, did not want to be adopted, all five of the Children, including J.M.-S. and Do.M.-S. were ambivalent about the termination of parental rights, and, given their parents' incarceration, all were in agreement with custodianship which is and has been the concurrent goal in the underlying dependency actions. The Children's strong desire and request is that they

13

all be together if possible. (N.T., 5/27/2017, pp. 26, 29, 61-66).

Health-wise, the Children are all doing well. They are up to date medically and with their dentists. Foster parents have seen to these needs. In addition, the children who have special needs or mental health issues are being properly treated. Finally, when the Children are all placed together, CYS plans to resume counseling for them.

Surprisingly, Father did not testify or present evidence. Mother testified. However, incredibly, she did not talk about her feelings towards the Children.

The agency asked for termination of both parents' parental rights and requested that the dependency goal – adoption with a concurrent goal of permanent placement with a legal custodian – be continued. Counsel for Father briefly stated that Father did not want his rights terminated, and indicated that given the circumstances Father did not oppose custodianship. (N.T., 5/26/2017, p. 61). Mother's attorney similarly indicated that Mother was opposed to termination of her parental rights, but was not opposed to custodianship of the Children in a single home. Counsel acknowledged that Mother has struggled, but briefly argued that because there is a bond between Mother and the Children, the Children should remain in custodianship until Mother "can get on her feet and do what's best for her children." (N.T., 5/26/2017, pp. 62, 66). The GAL confirmed the Children's positions and stated her strong belief that termination of parental rights is in their best interest. While the GAL has some concerns as to whether having all of the Children together in a single home would work, she advocated for the Children's desire to be together and indicated her own hope and desire that the plan developed by CYS would work. The GAL acknowledged the bond between Mother and the Children, but pointed out that the Children do not

14

write back to Mother at the jail and that, given the long history of these cases and all that has happened to them, the Children are conflicted. (N.T., 5/26/2017, pp. 62-66). The Children's attorney also confirmed that the Children were ambivalent about termination of parental rights. (N.T., 5/26/2017, p. 65).

As discussed above, at the conclusion of the hearing, we informed the parties that we would enter orders termination both parents' parental rights and summarized our reasoning on the record. The same day, we entered written decrees terminating the parental rights of Mother and Father. Mother and Father then filed these appeals.

## Discussion

In all five of her Rule 1925(b) statements, Mother lists the same four assignments of error. Her complaints reduce to a contention that we erred or abused our discretion in finding that CYS had proven by clear and convincing evidence grounds for termination of her parental rights under the statutory provisions cited by the Agency and that termination would serve the needs, welfare, and best interests of the Children. Father, in turn, posits the singular assertion that the decrees we issued were "entered in error and [are] not supported by competent or sufficient evidence in that [they are] based entirely on [Father's] incarcerations." There is no merit to the claims raised by either parent.

The law that we applied in terminating Mother's and Father's parental rights is well settled. In comprehensive summary:

In termination cases, the burden is upon the petitioner, in this case CYS, to prove by clear and convincing evidence that its asserted grounds for seeking the

15

termination of parental rights are valid. *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008). Clear and convincing evidence has been defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re K.Z.S.*, 946 A.2d 753, 757 (Pa. Super. 2008) (citation omitted). It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

Termination of parental rights is controlled by Section 2511 of the Adoption Act, 23 Pa. C.S.A. Section 2511. In this case, CYS seeks termination of Mother's parental rights on the following grounds:

**Section 2511. Grounds for Involuntary Termination**

(a)      General Rule. – The rights of a parent in regard to a child may be terminated after a petition filed any of the following grounds:

(1)      The parents have, for a period of more than six (6) months prior to the filing of this petition, failed to perform their parental duties;

(2)      The repeated and continued incapacity, abuse, neglect or refusal of the parents has caused the child to be without essential parental care, control or subsistence necessary for his physical and mental well-being and the conditions and causes of the inability, abuse, neglect or refusal have not been remedied by the parents;

\* \* \*

(8)      The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or

16

placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

(b)     Other considerations – The court in terminating the rights of a parent shall give primary consideration of the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C.S.A. Section 2511(a)(1), (2), (8), and (b). Satisfaction of any subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for involuntary termination of parental rights. *In re K.Z.S., supra; In re R.J.S.,* 901 A.2d 502 (Pa. Super. 2006). Accordingly, an appellate court "need only agree with the orphan's court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm." *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *app. den.,* 863 A.2d 1141 (Pa. 2004). *See also In re Adoption of C.J.P.,* 114 A.3d 1046 (Pa. Super. 2015); *In re K.H.B.,* 107 A.3d 175 (Pa. Super. 2014).

Section 2511 requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

17

> concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). *See also In re Adoption of C.J.P., supra; In re T.D., supra; In re Adoption of R.J.S.,* s*upra.*

In analyzing the conduct of a parent, the applicable statutory language must be considered. As the third sentence of Section 2511(b) directs, when subsections (a)(1), (6), or (8) of Section 2511(a) are cited as the grounds for termination, we may not consider actions of a parent to remedy the conditions that necessitated the dependent child's placement which are initiated after the parent receives notice of the filing of the termination petition. *In re Adoption of C.J.P., supra; In re K.Z.S., supra; In re D.W.,* 856 A.2d 1231 (Pa. Super. 2004).

Under Section 2511(a)(1), parental rights may be terminated if, for a period of at least six months, a parent *either* demonstrates a settled purpose of relinquishing parental claims to a child *or* fails to perform parental duties. *In re Adoption of R.J.S., supra; In re Adoption of J.M.M.*, 782 A.2d 1024 (Pa. Super. 2001). As the Superior Court has explained:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.

*In re K.Z.S., supra* at 758 (Pa. Super. 2008) (case citations and quotation marks omitted). *See also In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010).

18

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct. Rather, those grounds may include acts of refusal as well as incapacity to perform parental duties.

> Parental rights may be terminated pursuant to Section 2511(a)(2) if three conditions are met: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental wellbeing. 23 Pa.C.S.A. § 2511(a)(2). Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and **strong, continuous parental ties**, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it…. Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties.

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (case citations and internal quotation marks omitted) (emphasis in original). *See In re Adoption of R.J.S., supra.* Thus,

> While sincere efforts to perform parental duties can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness

19

> regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

*In re Z.P.*, 994 A.2d at 1117-18 (case citations and internal quotation marks omitted). Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child. *In re Adoption of Michael J.C.*, 486 A.2d 371, 375 (Pa. 1984); *In re Z.P, supra*.

In order for termination pursuant to 23 Pa.C.S.A. § 2511(a)(5) to be proper, "the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child." *In re K.H.B.*, 107 A.3d 175 (Pa. Super. 2014) (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1273–74 (Pa. Super. 2003)). *See also In re Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007), *app. den.*, 951 A.2d 1165 (Pa. 2008).

To terminate parental rights under Section 2511 (a)(8), the party seeking termination of parental rights need only show "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or the placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of R.J.S., supra* at 511. *See In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). The one year time period is significant. As the Superior Court has explained:

20

Section 2511(a)(8) sets a twelve–month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic period. The relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing. This Court has acknowledged:

> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re I.E.P.*, 87 A.2d 340, 345-46 (Pa. Super. 2014) (case citations and internal quotation marks omitted).

With respect to the "needs and welfare" analysis pertinent to subsections 2511(a) (5), (8), and (b), the Superior Court has observed:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the 'needs and welfare of the child' prior to proceeding to Section 2511(b), which focuses on the 'developmental, physical and emotional needs and welfare of the child.' Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the

21

second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa. Super. 2008) (*en banc*) (citations omitted). *See also In re I.E.P., supra; In re Adoption of K.J., supra* at 1133. Subsection 2511(a)(8), "does not require an evaluation of the remedial efforts of either the parent or DHS." *In re B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012) (citing *C.L.G.*, 956 A.2d at 1007).

Simply put, Section 2511, including the subsections cited and explained above, outlines certain irreducible requirements that parents must provide for their children. Parents who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have their parental rights terminated. *In re K.Z.S., supra; In re B.L.L.*, 787 A.2d 1007 (Pa. Super. 2001).

There is no simple or easy definition of parental duties. However, the appellate cases make it very clear that parenting is an active rather than a passive obligation that, even in the face of difficulty, adversity, and incarceration, requires a parent to take and maintain a place of importance in the child's life. The following passage is instructive:

Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be

22

met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

\* \* \*

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S., supra* at 759. *See also In re Burns*, 379 A.2d 535 (Pa. 1997); *Adoption of Baby Boy A. v. Catholic Social Services of the Diocese of Harrisburg*, 517 A.2d 1244 (Pa. 1986); *In re Shives*, 525 A.2d 801 (Pa. Super. 1987).

In relation to the parental requirements outlined in Section 2511, when a parent is separated from his or her child, it is incumbent upon the parent "to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life." *In re G.P.-R.*, 851 A.2d 967, 977 (Pa. Super. 2004). When a parent has abandoned or effectively abandoned a child,

[t]o be legally significant, the post abandonment contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to understand the parental role. ***The parent wishing to reestablish his***

23

> **parental responsibilities bears the burden of proof on**
> **this question.**

*In re T.D.*, 949 A.2d at 919 (case citations and brackets omitted) (emphasis in original). Finally, parents are required to make diligent efforts towards assumption or resumption of full parental responsibilities. Accordingly, a parent's vow to cooperate, after a long period of being uncooperative regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *In re Adoption of K.J., supra; In re A.L.D.*, 797 A.2d 326 (Pa. Super. 2002).

Once statutory grounds for termination have been established, the court must, in accordance with Section 2511 (b), consider whether the child's needs and welfare will be met by termination. A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. Intangibles such as love, comfort, security, and stability are involved in the inquiry. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond, if any, between parent and child. If a bond is determined to exist, the effect on the child of permanently severing the bond must be analyzed and considered. *See In re K.M.*, 53 A.3d 781 (Pa. Super. 2012); *In re T.D., supra; In re L.M., supra; In re Adoption of R.J.S., supra.* As to the bond analysis, the Superior Court has stated:

> In conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the

24

natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008).

*In re K.H.B.*, 107 A.3d 175, 180 (Pa. Super. 2014).

In addition to a bond examination, a court may equally

> emphasize the **safety** needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*In re K.Z.S.*, 946 A.2d at 763 (emphasis in original).

When, as here, the petitioner is an agency, "it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b). However, the existence or absence of a pre-adoptive home is an important factor. So is the relationship between the child and the foster or pre-adoptive parents. As our Supreme Court cogently stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. *In re: T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). *See In re K.M., supra.*

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated:

> [I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare

25

of the child.' 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include '[i]ntangibles such as love, comfort, security, and stability. In *In re E.M.,* [620 A.2d 481, 485 (Pa. 1993) ], this Court held that the determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention'" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.* 71 A.3d at 267. The Court additionally observed:

contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved....Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a

26

substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children.

*In re T.S.M.,* 71 A.3d at 269.

In this case, Mother and Father were incarcerated multiple times while the Children have been in care. In fact, they are currently in jail. Incarceration, standing alone, neither constitutes sufficient grounds for termination of parental rights nor removes the obligation to perform required "bond effects" and "needs and welfare" analyses. However, it is a factor that must be considered and, in a proper case, such as when a parent is serving a prohibitively long sentence, may be determinative. *In re Adoption of S.P.,* 47 A.3d 817 (Pa. 2012); *Z.P.,* 994 A.2d at 1120. "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind...that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what [he or] she is supposed to be doing in prison." *In re E.A.P.,* 944 A.2d at 84.

The analysis depends in part on the asserted grounds for termination. In subsection (a)(1) abandonment cases, our Supreme Court has stated:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.

27

> Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.,* 47 A.3d at 828 (quoting *In re Adoption of McCray,* 331 A.2d 652, 655 (Pa. 1975) (footnotes and internal quotation marks omitted). Thus, in an abandonment case, a parent is required to *both* utilize available resources *and* take affirmative steps to support a parent-child relationship. If the parent fails to do so, his or her parental rights may be terminated. *See In re Adoption of W.J.R.,* 952 A.2d 680 (Pa. Super. 2008); *In re E.A.P., supra; In re K.J., supra.* However, utilization of available resources does not guarantee preservation of parental rights. The statutory criteria, the facts and circumstances of each case, and the best interests, needs, and welfare of the child must all still be considered.

In cases involving parental incapacity, our Supreme Court recently held that:

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P,* 47 A.3d. at 828. In more expanded terms, the Supreme Court stated:

> In line with the expressed opinion of a majority of justices in *In re R.I.S.,* 614 Pa. 275, 36 A.3d 567 (2011), our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be

28

considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*Id.* at 830. In sum, a parent's incarceration "is relevant to the subsection (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the "essential parental care, control or subsistence" that the section contemplates." *In re A.D.*, 93 A.3d at 897.

Finally, before filing a petition for termination of parental rights, the Commonwealth is generally required to make reasonable efforts to promote reunification of parent and child. *In re Adoption of R.J.S.. See also In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). However, the Commonwealth does not have an obligation to make reunification efforts indefinitely.

> The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. When reasonable efforts to reunite a foster child with his or her biological parents have failed, then the child welfare agency must work toward terminating parental rights and placing the child with adoptive parents. The process of reunification or adoption should be completed within eighteen (18) months. While this time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re Adoption of R.J.S., supra* at 507 (internal case citations, quotation marks, and footnote omitted).

29

Applying the law summarized above to the facts of this case, we found that statutory grounds for termination of Mother's and Father's parental rights had been established by clear and convincing evidence, and further, that termination of their rights best served the needs and welfare of the Children. Prompted by these appeals, we have again carefully reviewed the record and remain convinced that our decision as to each of the Children is supported by both the facts and the law, and, moreover, fulfilled and advanced the Children's best interests.

Amplifying and building upon the reasoning we expressed on the record at the May 26, 2017 TPR hearing:

CYS has been involved with this family for 40 months. The Children have continuously been in care that entire time. Despite the provision of substantial services by CYS, and a second chance given when the first TPR petitions were denied, both parents have demonstrated an inability to remedy the conditions which caused the Children to be placed or to put themselves in a position to satisfy service plan goals.

Specifically, Mother have Father have taken turns being incarcerated and then, after being released, progressing almost to the point where the Children could potentially be transitioned back home only to be arrested and jailed again. Currently, both are in jail. As of the third TPR hearing, Father was awaiting trial on felony drug charges for which, if convicted, he is facing substantial additional jail time. Mother, in turn, is currently serving a sentence with the possibility of parole later this year, but a maximum sentenced date that could carry her incarceration into 2020.

While Mother has during her most recent incarceration written to the Children and applied to participate in prison programs, we found and now reaffirm our belief

30

that Mother's actions in this regard were nothing more than bald, perfunctory, *pro forma,* and insufficient attempts to stave off termination of parental rights that fell far short of the mark and rang hollow. In both the statutory and common meanings of the term, Mother's periods of incarceration have incapacitated and continue to incapacitate her from parenting the Children. So have Father's. Further, Father has not during his current incarceration even made perfunctory or pretextual efforts to visit or write to the Children or avail himself of available resources.

Along similar lines, both parents have been unable to abstain from using or selling drugs. These behaviors have led Mother and Father to remain embroiled in the criminal justice system which, in turn, has prevented them from being able to obtain and maintain suitable housing and employment or to meet other service plan goals.

Further, for more than three and one-half years, foster families, not Mother and Father, have provided nurturing and care for the Children and have insured that their physical, mental, emotional, medical, developmental, and daily needs have been met. Indeed, in the middle of these cases there was a significant period of time during which Mother had very little contact with the Agency and neither visited nor wrote to the Children. Through their actions which have repeatedly landed them in jail, both parents have effectively abandoned the Children and allowed others to raise them.

Finally, all statutory and other time requirements have been met. This includes, but is not limited to, the time requirements of the statutory grounds for termination cited by CYS.

Under these circumstances and the evidence presented at hearing, it was clear to us that CYS established grounds for termination of Mother's and Father's parental

31

rights to the Children under subsections 2511(a)(1), (2), (5), and (8). We remain firmly of that opinion.

With respect to the bond effects and needs and welfare analyses required by Sections 2511 (a)(8) and (b) and applicable case law, it was just as clear to us that the best interests and welfare of the Children required that both parent's parental rights be terminated.

There is no question that there are familial bonds between the parents and the Children. However, and tellingly, at the TPR hearings neither parent expressed for himself or herself their love for or bond with the Children. Instead, persons other than Mother and Father expressed that both parents love the Children and that the Children love and are bonded with them. Regardless of how expressed, a parent's own feelings of love and affection for a child, standing alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010); *In re L.M.*, 923 A.2d 505 (Pa. Super. 2007). This is especially true where, as here, the purported feelings are conveyed by third parties and not the parent and the parent's actions contradict the statements of the proxy. Moreover, the expressions of love and bonding made on behalf of Mother and Father have not been enough to prompt them to stay out of prison, take advantage of the services provided by CYS, stop using drugs, or put themselves in the position of being capable of caring for or parenting the Children. Simply, Mother and Father have not demonstrated the parental capabilities and stability that the Children need and deserve.

Further, it was clear to us that the bond that exists is no longer healthy for the Children. As we stated during the hearing, both parents have taken the Children on a

32

roller coaster ride that has, to put it mildly, left the Children wanting, spent, and effectively without parents. Even worse, the ride has adversely affected the Children's mental and emotional health and their behaviors have suffered greatly. The Children do not write back to Mother in jail. They have become resigned and numb to parents' recurrent incarcerations and have done the math to see how old they will be under various scenarios when one or both of their parents are again released from prison. They are ambivalent about termination of parental rights. While the two oldest may not at this time want to be adopted, they do not contest and understand the need for custodianship.

The Children need and deserve permanency, stability, love, support, and parental care. Their needs are not being and have not been met by Mother or Father and, given the facts of these cases, including but not limited to length of time the Children have been in care, the continuing and alternating periods of incarceration, the substantial services that have been put in place and resources expended trying to assist both parents in achieving reunification, the number of chances both parents have been given, and the current incarcerations, nothing in the record suggests that Mother or Father will be able to meet the Children's needs in the future. The overwhelming evidence supports termination of parental rights on the grounds asserted by CYS. Moreover, given the facts presented at hearing, and considering the history of both parents, we found that the Children's lives could not and should not be put on hold in the hopes that, at some point in the future, Mother or Father will summon the ability to handle the responsibilities of parenting while staying out of jail, refraining from selling drugs, and maintaining stable and suitable housing, a job, and

33

sobriety.

On the other hand, CYS has now put together a plan that will provide permanency for all of the Children, whether through adoptions, custodianships, or a combination of permanency options. This will be accomplished while at the same time achieving the Children's goal of being together in one home. For over 40 months now, foster families, not parents, have provided the Children with the love, support, nurturing, and care that parents have been unable to provide, that the law requires, and that the Children deserve. Now, finally, the Children will be able to receive nurturing and care, together, in one family unit.

Simply, under these facts, we found that the bonds that exist between the parents and the Children are no longer healthy for the Children. Severing the bonds between the Children and both parents will promote the Children's mental and emotional health, safety, and welfare while allowing permanency to finally be achieved.

We stand by our decisions.

Date: 7/11/17



Jonathan Mark, J.

Cc:     Superior Court of Pennsylvania
        Jonathan Mark, Judge
        Brandie Belanger, Esq.
        Public Defender (JF)
        Hillary Madden, Esq.
        Lara Kash, Esq.
        Elizabeth B. Weekes, Esq.
        MCCY

34